Ryoko **Ito**, as Personal
Representative of the Heirs
of Akinobu Ito, Deceased,
Plaintiff/Appellee/Cross-Appellant,
**v.**
**Macro Energy, Inc.**, Marianas
Ocean Enterprises, Nobuo
Hirai, Shigemi Yamagishi,
American Home Assurance
Company, Defendants/
Appellants/Cross-Appellees.
Appeal Nos. 92-020 & 92-022
Civil Action No. 89-0918
October 26, 1993

Argued and Submitted March 15, 1993

Counsel for appellee/cross-appellant Ryoko Ito: William M. Fitzgerald, Saipan.

Counsel for appellant/cross-appellee Nobuo Hirai: Harold A. Stone and Francis M. McKeown, San Francisco, California (Gudmundson, Siggins, Stone & Skinner); Vicente T. Salas, Saipan (Salas & Manibusan).

Counsel for appellants/cross-appellees Macro Energy, Inc., and Shigemi Yamagishi: Charles A. Lynberg and Randall J. Peters, Los Angeles, California (Lynberg & Watkins); James E. Hollman, Saipan.

Counsel for appellant/cross-appellee Shigemi Yamagishi for insurance matters: James H. Grizzard, Saipan.

Counsel for appellant/cross-appellee Marianas Ocean Enterprises: Lecia M. Eason, Saipan (Wiseman, Eason & Halsell).

Counsel for appellant/cross-appellee American Home Assurance Company: Randall Todd Thompson, Guam (Mair, Mair, Spade & Thompson); Michael A. White, Saipan (White, Novo-Gradac & Manglona).

BEFORE: DELA CRUZ, Chief Justice, VILLAGOMEZ, Justice, and CRUZ, Special Judge.

DELA CRUZ, Chief Justice:

This consolidated appeal involves several issues arising from the plaintiff's wrongful death suit as personal representative for the heirs of the decedent, Mr. Akinobu Ito. Ito drowned while on a scuba diving trip supervised by the defendants. On the day of his death, Ito signed an "AGREEMENT FOR EXEMPTION FROM OBLIGATION."

The trial court ruled on a pre-trial motion that the release exonerated defendants Macro Energy, Inc. ("Macro") and Marianas Ocean Enterprises ("MOE"), but not defendants Yamagishi and Hirai. After a two-week trial, the trial court found that Yamagishi and Hirai's negligence was a proximate cause of Ito's death, and entered judgment for the plaintiff. The threshold issue on this appeal is whether the release exonerates any of the defendants for their negligence. The plaintiff and the defendants also raise several other issues on appeal, including one involving the coverage liability of defendant American Home Assurance Company.

We hold that the release does not exonerate any defendant because, as drafted, it does not comply with RESTATEMENT (SECOND) OF TORTS § 496B (1965), the applicable rule in the Commonwealth governing express assumption of risk. We therefore go on to address the other issues raised by the parties.

## I. PROCEDURAL HISTORY

This lawsuit was filed by Ryoko Ito ("plaintiff"), as personal representative of the heirs of her deceased husband, Akinobu Ito ("Ito").[1] Ito drowned on September 24, 1988, during a scuba diving accident at Saipan's "Grotto."

The other parties in this lawsuit are as follows:

Macro Energy, Inc. ("Macro"), the Saipan-based scuba diving company that trained Ito to dive in June of 1988 and to which he returned on September 24, 1988.

Marianas Ocean Enterprises ("MOE")—alleged to be the "alter ego" of Macro.

Shigemi Yamagishi ("Yamagishi")—diving instructor and Macro's president.

Nobuo Hirai ("Hirai")—assistant instructor employed by Macro.

American Home Assurance Company ("American Home")—Macro and Yamagishi's insurer during all relevant dates.[2]

---

[1] The CNMI's wrongful death statute is found at 7 CMC § 2101. Subsection (a) provides, in part:

> When the death of a person is caused by [a] wrongful act, neglect or default such as would have entitled the party injured to maintain an action and recover damages in respect thereof if death had not ensued, the person or corporation which would have been liable if death had not ensued . . . is liable to an action for damages notwithstanding the death of the person injured . . . .

[2] American Home Assurance Company was named as "American Home Insurance Company" in the plaintiff's complaint. American Home Assurance Company appeared and

The plaintiff's complaint contained four causes of action relating to: (1) negligent instruction by defendants in the June 1988 scuba diving course; (2) negligence of defendants on the day of Ito's death, September 24, 1988; (3) coverage under the American Home insurance policy[3] and (4) MOE's alter-ego relationship with Macro.

On November 7, 1990, Macro, American Home, Yamagishi, and Hirai moved for summary judgment under RESTATEMENT (SECOND) OF TORTS § 496B (1965), based on the "AGREEMENT FOR EXEMPTION FROM OBLIGATION" (hereinafter "release agreement" or "release") which Ito signed on the morning of his accident. The trial court granted the motion as to all four movants on December 17, 1990. On December 27, 1990, the plaintiff moved for reconsideration of the order granting summary judgment.

On January 21, 1991, the trial court heard oral argument on the plaintiff's motion for reconsideration, and, on January 28, 1991, entered an "Amended Summary Judgment" and "Memorandum Decision" which held that Yamagishi and Hirai were not released from liability.[4] The trial court also ruled that, although MOE was not a movant, "[s]ince the complaint included MOE as a defendant based upon the theory that it was the alter ego of Macro, the grant of summary judgment does run in favor of MOE." *Ito v. Macro Energy, Inc.*, Civ. No. 89-0918 (N.M.I. Super. Ct. Jan. 28, 1991) (Memorandum Decision at 4). Therefore, after January 28, 1990, the plaintiff's case stood only against defendants American Home, Yamagishi and Hirai.

On April 16, 1991, after a hearing on a motion for summary judgment brought by American Home, the trial court ruled that American Home's liability coverage was limited to $100,000. It also ruled that the plaintiff had waived her claim for loss of consortium. *See Ito v. Macro Energy, Inc.*, Civ. No. 89-0918 (N.M.I. Super. Ct. Apr. 16, 1991) (Memorandum Opinion).

Thereafter, in September 1991, American Home, Yamagishi and Hirai moved, pursuant to Com. R. Civ. P. 54(b), for certification of (1) the trial court's January 28, 1991, judgment regarding the release and (2) the trial court's April 16, 1991, order regarding the policy limits and the plaintiff's claim for loss of consortium. We dismissed these appeals because they were not final within the meaning of Com. R. Civ. P. 54(b). *See Ito v. Macro Energy, Inc.*, 2 N.M.I. 459 (1992).

A two-week trial was held between May 26, 1992, and June 5, 1992, after which the trial court entered judgment in the amount of $2,434,857.55 against Hirai, Yamagishi and American Home. On August 10, 1992, after motion by American Home, the court issued an amended judgment limiting American Home's liability for damages to $100,000.

Yamagishi and Hirai timely filed a joint notice of appeal on August 14, 1992. The plaintiff also timely appealed on August 21, 1992. We consolidated the two appeals on September 22, 1992. Other procedural matters of this case are set forth where pertinent, below.

## II. FACTS

The following seventy-three points of fact are taken verbatim from the trial court's Findings of Fact and Conclusions of Law, *Ito v. Macro Energy, Inc.*, Civ. No. 89-0918 (N.M.I. Super. Ct. June 22, 1992) (hereinafter "Findings of Fact").[5]

1. In June of 1988, the decedent, Akinobu Ito ("Ito") with Yosuhiro Fujitomi ("Fujitomi") enrolled in a scuba diving course offered by MACRO Energy, Inc. ["Macro"] in Saipan.

2. Shige Yamagishi ("Yamagishi") is a shareholder and a director of [Macro].

3. Yamagishi is the diving instructor of [Macro].

4. Ito enrolled in the scuba diving course so that he [could] obtain[] certification as an open water diver.

5. The course [Macro] offered Ito, require[d] minimal pre-dive instruction and training. There was no pool or confined water training. Written student testing consisted of requests for student/volunteers to answer questions orally whether the students answered the questions correctly or not the instructor revealed the answer to the students who filled in the answers on their

---

litigated this action despite the defect. Accordingly, we have corrected its name in the caption of this decision.

[3] The plaintiff brings this suit against American Home pursuant to the Commonwealth's "direct action" statute. 4 CMC § 7502(e).

[4] The trial court's amended summary judgment does not state why the trial court changed course. The court wrote: "[U]pon further review of the Exemption Agreement, the court finds that its coverage does not extend to defendants Hirai and Yamagishi individually." *Ito v. Macro Energy, Inc.*, Civ. No. 89-0918 (N.M.I. Super. Ct. Jan. 28, 1991) (Memorandum Decision at 4). Defendants Yamagishi and Hirai contend on appeal that the trial court amended its order because they were not specifically mentioned in the release.

[5] Defendants do not directly challenge the trial court's factual findings except to argue that (1) the trial court applied a wrong standard of care in evaluating their dive course and supervision, and (2) the trial court's damage award was excessive and clearly erroneous. These issues are discussed below.

▮▮▮▮▮▮▮▮

book. Water instructions took place inside the Grotto.[6]

6. Upon the completion of Ito's scuba diving course, Yamagishi signed a certification card certifying Ito as an ADS open water diver. ADS is a Japanese scuba diving agency that issues a card certifying a diver as an open water diver.

7. Yamagishi signed a certification card certifying Ito as a CMAS one-star diver. CMAS is a French agency which is internationally recognized around the world and issues a card certifying a diver as a CMAS one-star diver.

8. Although Yamagishi signed the ADS and CMAS certification for Ito, he never personally instructed Ito in the class or in the water instruction in the Grotto.

9. Open water diver is a term recognized as being required in any certification course issued by various agencies. Various agencies around the world certify people as scuba divers under standards established for their respective agencies.

10. The course that Ito and Fujitomi attended to receive their open water diver certification did not meet the minimum standards.

11. CMAS has specific standards which describe the knowledge and skills required in order for a diver to be granted a CMAS one-star diver certificate.

12. CMAS has a diver training program which indicates the current standard of training necessary in order to reach the minimum level of proficiency required for the award of a CMAS one-star diver certificate.

13. The course that Ito attended to receive his open water certification did not meet the standards or follow the training program required by CMAS.

14. Yamagishi did not exercise reasonable care as a scuba instructor in certifying Ito as an open water diver and a CMAS one star diver.

15. The following is a partial list of the deficiencies of the course that Ito took before Yamagishi issued the two certification cards:

---

[6] The Grotto is a sometimes turbulent pool of water surrounded on three sides by a natural rock formation. It contains three underwater outlets through which a diver can swim into the Pacific Ocean. These outlets differ in length and width. The north entrance requires a diver to go fifteen feet underwater and swim under an overhead rock formation for another ten to fifteen feet. This outlet is very simple to dive. It was revealed at trial that on a calm day, a strong swimmer can "free dive" under the rock formation and out to the ocean quickly without the assistance of an underwater breathing apparatus. This was not the hole used by the divers in this case. The hole that was used was the center hole. This hole is approximately twenty meters [65.6 feet] underwater and is approximately 120 feet in length.

(a) Unqualified persons were employed as instructors.

(b) Students were not given textbooks.

(c) Ito was not given time to study for a theory test.

(d) Ito was not given a formal test that would require him to prove mastery of scuba diving theory.

(e) No accurate records exist of by whom or what Ito was taught.

(f) No accurate records exist to prove that Ito demonstrated his mastery of the required scuba diving skills to a qualified instructor.

(g) No record exists to prove that Ito was taught scuba diving theory by a qualified instructor.

(h) Ito was taught a major part of the course by Aline Bouhey who was not a qualified instructor at the time.

(i) The only records that do exist were fabricated by Shige Yamagishi after Akinobu Ito was dead.

(j) The confined water training was done at the Grotto which is not an appropriate place to learn the necessary skills.

(k) Open water dive training was virtually non-existent and provided no opportunity to practice skills during supervised ocean dives.

(l) Octopus breathing was not taught.

(m) The number of exposures to each skill was not enough to learn the skill.

(n) Ito was not taught rescue techniques.

16. Yamagishi deceived Ito into believing that he was receiving the legitimate CMAS one star course and a legitimate open water diver course.

17. Ito was not aware of all the risks of scuba diving as a legitimate CMAS one star diver and an open water diver would be because he had not been properly trained.

18. Failure to receive the proper training in the scuba diving course that Ito took in June, 1988 was a proximate cause of Ito's death [on] September 24, 1988.

19. In September, Ito returned to Saipan to go scuba diving.

20. On September 24, 1988, Ito paid for the services of a dive guide because he did not want to dive unsupervised.

21. Shige Yamagishi and Nobuo Hirai were aware that Akinobu Ito was a CMAS one star diver, and that he had had only one ocean dive outside of the inner pool of the Grotto.

22. Yamagishi and Hirai knew that the dive that they planned to take Ito, along with fourteen other people, on[] that day was a deep dive and that Ito had never dove deeper than [thirty] feet.

23. Yamagishi and Hirai knew that divers must be closely supervised on their first deep dive.

52

24. A dive of more than 100 feet is a deep dive.

25. Yamagishi and Hirai undertook to render the service of dive guide and dive supervisor of Akinobu Ito.

26. Yamagishi and Hirai failed to exercise reasonable care in the performance of supervising the dive.

27. Yamagishi was a shareholder and officer of the company that provided the scuba diving equipment and was responsible for its proper maintenance.

28. The regulator given to Ito leaked air which may have caused air to be used faster than normal.

29. The pressure gauge of the regulator given to Ito read 130 psi higher than was actually in the tank, so if the gauge read 400 psi, it actually only had 270 psi in the tank.

30. Yamagishi and Hirai failed prior to the dive to familiarize themselves with the divers under their charge and their respective abilities.

31. Yamagishi and Hirai failed to discuss with Ito the special circumstances of a dive to more than 100 feet, including the more rapid exhaustion of air and nitrogen narcosis.

32. At the site of the Grotto, Yamagishi and Hirai failed to give an adequate dive briefing and failed to check Ito's equipment.

33. During the first half of the dive, Yamagishi was the only guide with fourteen divers.

34. Yamagishi led the dive to a depth of more than 100 feet[,] far beyond the training capabilities of Ito.

35. Scuba divers are required to dive with a partner termed a buddy; Fujitomi and Ito were buddies.

36. Fujitomi developed a problem with his air source and was assisted by Hirai and the two rose to the surface.

37. At the time that Fujitomi rose to the surface, Ito followed the correct procedure that he had been taught and followed his buddy Fujitomi to the surface.

38. At the time Ito, Fujitomi and Hirai rose to the surface, Yamagishi was at the mouth of the central entrance to the Grotto, with all the other divers between them.

39. At the time that Fujitomi rose to the surface Hirai failed to signal Yamagishi to halt the dive and Yamagishi failed to wait to resolve the problem.

40. With two divers on what he claims is the dangerous surface, Yamagishi, without determining their problem, turned and led the other divers back through the Grotto entrance and at no time after that did Yamagishi ever search for them.

41. At the time that Ito rose to the surface Hirai did not instruct him to immediately descend and join the other divers.

42. At the time that Ito rose to the surface Hirai did not check Ito's remaining air supply.

43. Hirai directed Ito to follow him down and then chose the longest and deepest way to return to the surface inside the Grotto.

44. A much easier and safe alternative was available to Hirai by snorkeling on the surface with inflated BCD and then returning through the much more shallow and shorter northern entrance.

45. At the entrance to the tunnel to return to the inner Grotto, Hirai had 1500 psi of air, a very comfortable supply even for two people.

46. At the same point Ito had only between 400-500 psi, a questionable amount, particularly because at readings of less than 500 the pressure gauges are not as accurate as they are at higher readings.

47. Instead of swimming normally holding on to Fujitomi and Ito, Hirai turned upside down and pulled himself along the roof of the center tunnel of the Grotto, with Fujitomi clutching his tank and he using his hands to pull himself along the roof.

48. Hirai's goal seemed to be to arrive at the surface in the fastest time rather than in the safest way, yet there was no reason for his haste, since he had ample air.

49. Hirai's decision to pull himself along the roof prevented him from maintaining a clear view of Ito and keeping Ito close by holding onto Ito's vest.

50. At some point in the tunnel, Ito gave Hirai an out of air sign and Hirai gave him his octopus regulator.

51. Hirai did not hold Ito's vest while Ito was using his regulator in violation of the standard procedure that he had learned in his training.

52. Hirai continued his unreasonable crawl along the roof upside down, instead of swimming normally to the surface while holding onto Ito and Fujitomi.

53. After discovering that Ito was not together with him when he surfaced, Hirai dove and brought Ito to the surface.

54. The most important thing to do for a submersion incident victim is to get the victim out of the water as quickly as possible.

55. Hirai and Yamagishi did not take Ito directly out of the water but attempted for fifteen to twenty minutes to resuscitate him in the water.

56. At this time one of the members of the dive group, a Dr. Takagi, surfaced and observed that Hirai and Yamagishi were supporting Ito on the surface and giving mouth to mouth resuscitation to him; he noted the time as 10:46.

57. Takagi watched for three or four minutes and then went over to help, Yamagishi told him to take Ito's pulse, and he did noting that the pulse was [sixty] and beating normally. Yamagishi told Takagi to make sure

53

in taking the pulse. Ito vomited water a number of times.

58. Thereafter at two to three minute intervals Takagi continued to take Ito's pulse and it continued to beat at rate of about [forty/fifty] per minute.

59. Shortly after 11:00 the pulse rate became drastically weak and pinkish water started coming out of Ito's mouth.

60. At 11:03 the pulse became [zero], and Yamagishi said to get him up, and other people then helped to get him up and out of the water, where heart massage was commenced and mouth to mouth resuscitation continued.

61. At about 11:10 the ambulance arrived and they carried Ito away and he was pronounced dead on arrival at the Commonwealth Health Center.

62. The appropriate treatment for either drowning or air embolism is oxygen. Yamagishi and Hirai did not have oxygen at the Grotto.

63. Akinobu Ito's cause of death was drowning.

64. Yamagishi and Hirai made statements to the police and other agencies immediately after the incident but did not mention seeing blood in the water.

65. Blood is a potential symptom of air embolism but is seldom seen.

66. Air embolisms occur because of a change in pressure upon ascent, and descent.

67. Pink froth is indicative of pulmonary edema which results from the inhalation of water or other foreign matter to the lung.

68. The blood found in Ito's stomach resulted from his stomach ulcer.

69. Hirai stated in a memorandum to the Japanese Consulate that at 11:05 Ito had a weak pulse.

70. At the time of his death Akinobu Ito was [forty-six] years old, gainfully employed by a major Japanese company, earning more than $60,000 a year. He expected to work for that same company or one of its subsidiaries until he was seventy years old.

71. Akinobu Ito is survived by a loving wife Ryoko and two children, Chiyo and Masteru.

72. The income that Akinobu Ito could have been expected to provide to his wife and children over his working life reduced to present value at an exchange rate of -126.78/$ is $2,389,857.55.

73. Funeral and burial expenses total $45,000.

## III. ISSUES PRESENTED AND STANDARDS OF REVIEW

■ 1. The threshold issue on this appeal is whether Ito expressly assumed the risk of harm arising from defendants' negligence by signing the release, and, if so, which defendants are exonerated by operation of the release. The trial court interpreted the release as exonerating defendants Macro Energy and MOE and entered summary judgment in their favor. We review de novo the effect of the release on the question of liability. *Rios v. Marianas Pub. Land Corp.*, 3 N.M.I. 512 (1993).[7]

■ 2. Whether Ito impliedly assumed the risks which led to the accident.

3. Whether Ito was contributorily negligent.

4. Whether the trial court applied an incorrect standard with respect to defendants' duty of care.

Issues two through four involve mixed questions of law and fact and therefore are reviewed de novo. *Id.*

■ 5. Whether the trial court erred in failing to consider defendant Hirai's motion for summary judgment to enforce a settlement agreement on the date set for trial. A trial court's failure to rule on a motion is a denial thereof by operation of law and, in this case, implicates the trial court's power to control its docket. We therefore review its ruling for abuse of discretion. *Atchinson, Topeka & Santa Fe Ry. Co. v. Parr*, 391 P.2d 575 (Ariz. 1964); *Edwards v. Cass Cty., Tex.*, 919 F.2d 273 (5th Cir. 1990).

■ 6. Whether the trial court erred in ruling that the plaintiff had waived her loss of consortium claim. The trial court found that the plaintiff's counsel "admitted" that the plaintiff had no claim for consortium on summary judgment. Such ruling is a conclusion of law and is reviewable de novo. *Rios, supra.*

■ 7. Whether the trial court erred in its calculation of damages and in not revealing its calculations in determining damages. Damage awards are reviewed under a "clearly erroneous standard." *Reyes v. Ebetuer*, 2 N.M.I. 418 (1992).

■ 8. Whether the trial court erred in ruling that American Home's coverage under the policy is limited to $100,000. The trial court's interpretation of language in an insurance policy involves a question of law which is subject to de novo review. *Tokio Marine & Fire Ins. Co., Ltd. v. Marianas Ocean Enters., Inc.*, 3 CR 748, 753 (D.N.M.I. App. Div. 1989).

---

[7] In the trial court, the plaintiff and MOE briefed the issue of whether MOE was Macro's "alter-ego." However, "the issue was not resolved in the trial court. Instead, summary judgment proceedings commenced on the issue of the express release agreement." *See* MOE's Response Brief at x (footnote omitted). We do not decide the alter-ego issue because it has not been raised in this appeal.

## IV. ANALYSIS

### 1. Ito's Express Assumption of the Risk

The release which Ito signed before the diving accident and which is critical to this litigation states as follows:

**MACRO ENERGY, INC.**

. . . .

<u>APPLICATION FOR PARTICIPATING IN SCUBA DIVING & INVOICE</u>

. . . .

(AGREEMENT FOR EXEMPTION FROM OBLIGATION)

I SUBMITTED AN APPLICATION FOR PARTICIPATING IN THE DIVING TOUR AND OR TRAINING PROGRAM TO BE CONDUCTED BY YOUR AGENCY. I FULLY ACCEPT AND UNDERSTAND THAT SUCH A DIVING TOUR AND TRAINING INVOLVES BASIC RISK AND DANGER. IF WE FAIL TO ABIDE BY THE RULES AND REGULATION SET BY THE GUIDES AND INSTRUCTORS AND IF WE NEGLECT THE DIVING RULES, WE REALIZE THAT WE MAY RISK OUR LIVES. ALL THE RISKS THAT WE MAY HAVE DURING THE PERIOD OF STAY HERE BELONG TO EACH OF US PERSONALLY. IN CASE OF ACCIDENT, CAUSING INJURY OR DEATH TO MYSELF, I MYSELF, MY FAMILY, OR INHERITED ORGANIZATION AND OTHER RELATED PERSONNEL SHALL HAVE NO RIGHT TO PROTEST AGAINST NOR TO CLAIM FOR DAMAGES. WE HEREBY SWEAR TO ABIDE BY AND ACT AT THE RULES AND INSTRUCTIONS SET BY THE GUIDES AND INSTRUCTORS. ALSO I AM FULLY A GROWN UP AT LAW AND I ACKNOWLEDGE THE FACT THAT I AM FULLY QUALIFIED TO SIGN THIS AGREEMENT, TO VERIFY THE EXEMPTIONS FROM ALL THE CLAIMS FOR DAMAGES. ALL THE ITEMS IN THIS APPLICATION ARE TO BE DECIDED BY THE AGREEMENT, AND I PERSONALLY SIGN THIS DOCUMENT AT MY OWN WILL RATHER THAN SOMEONE DIRECTING ME TO SIGN THIS PAPER.

The release also contained the above paragraph in Japanese.[8] The release was signed by Ito and dated "9/24/88." The trial court initially ruled that the release exonerated all defendants, but subsequently amended its summary judgment and ruled that the release did not exonerate defendants Yamagishi, the president of Macro Energy, and Hirai, an employee of Macro Energy.

▌▌▌▌▌ In the Commonwealth, the rules of the common law as expressed in the Restatements of the Law as approved by the American Law Institute serve as the applicable rules of decision, in the absence of written or local customary law to the contrary. 7 CMC § 3401. Because we have no statute or local customary law regarding express releases, RESTATEMENT (SECOND) OF TORTS § 496B (1965) (hereinafter "§ 496B") is applicable. That section provides: "A plaintiff who by contract or otherwise expressly agrees to accept a risk of harm arising from the defendant's negligent or reckless conduct cannot recover for such harm, unless the agreement is invalid as contrary to public policy."

There is no dispute that the release is either a "contract" or a document by which Ito may have "otherwise expressly agree[d]" to assume certain risks. There also is no dispute that Ito read and executed the release. The issue on appeal concerns the language of the release instrument, and whether that language, as a matter of law, exonerates defendants from their negligence. We conclude that it does not.

### A. The Requirements of § 496B

▌▌▌▌ In order for a release to be valid and binding, it must comply with the requirements of § 496B. In determining whether the release meets the requirements of § 496B, we shall strictly construe the language of the release, *Schutkowski v. Carey*, 725 P.2d 1057, 1060 (Wyo. 1986), especially where, as in this case, it is drafted by defendants and purports to exonerate them.

---

[8] The decedent apparently was proficient only in Japanese, and read the Japanese language version of the release before signing it. At oral argument, counsel for the plaintiff stated that only the English language version of the release has been the subject of dispute in this lawsuit. Defendants do not contend otherwise, nor do they assert that the Japanese version of the release contains language which in legal effect differs from the English version. Therefore, our decision is based solely on the English language version.

*Heil Valley Ranch, Inc. v. Simkin*, 784 P.2d 781, 784 (Colo. 1989); *see also* § 496B cmt. d.

■ By signing the release, Ito must have *"expressly agree[d]* to accept a risk of harm *arising from the defendant[s'] negligent or reckless conduct."* (Emphasis added.) We turn to the language of the release to determine what risks Ito "expressly" agreed to assume.

In doing so, we find no mention of Ito accepting a risk of harm arising from the "defendant[s'] negligent conduct." The release contained no language that the risk of harm which Ito agreed to assume was that harm which may have arisen due to defendants' negligence. Although the release states that "ALL THE RISKS THAT WE MAY HAVE DURING THE PERIOD OF STAY HERE BELONG TO EACH OF US PERSONALLY" and that Ito (or his heirs) will not file suit "IN CASE OF ACCIDENT, CAUSING INJURY OR DEATH TO MYSELF," it fails to mention that the risks encompass defendants' negligence.

The language of the release did not "expressly" warn or alert Ito that the risk of harm he was assuming was one that could arise from defendants' negligence. Absent clear language in the release itself, we are not persuaded, as a matter of law, that the release meets the requirements of § 496B: that Ito "expressly agree[d] to accept a risk of harm arising from the defendant[s'] negligent or reckless conduct."

■ "[A]lthough uniformly agreeing that exculpatory agreements must be strictly construed against the drafter, [courts] are split on whether 'negligence' must be specifically mentioned [in a release], or whether more inclusive and general terms may be employed." *Heil Valley Ranch, Inc.*, 784 P.2d at 784 (footnote omitted). This split in authority regarding such a requirement appears to be based on the various jurisdictions' public policy views pertaining to these types of releases, and how each views the importance of the language of the release itself, i.e., whether the language is sufficiently clear so that the one signing it knows what is being given up. In the absence of legislation, the common law is developed based on the application of general notions of justice and fair play, taking into account the circumstances and experiences unique to a particular jurisdiction.

Our jurisdiction is not vested with a similar degree of freedom in formulating our own common law as that exercised by courts in other jurisdictions, because of the statutory dictate that we apply the Restatement. 7 CMC § 3401. Thus, we must acknowledge the doctrine of express assumption of risk as set forth in § 496B, which is part of our "rules of decision" in the Commonwealth. *Id.*

■ In interpreting § 496B, however, we shall side with those jurisdictions which take the more cautious approach with respect to express assumption of risk. In doing so, we interpret § 496B as requiring that a release must expressly mention that the risks of harm being assumed by a releasor include those arising from a releasee's negligence or reckless conduct. Certain notable jurisdictions have taken this approach to releases. *See Saenz v. Whitewater Voyages, Inc.*, 276 Cal. Rptr. 672 (Ct. App. 1990); *Madison v. Superior Ct.*, 250 Cal. Rptr. 299 (Ct. App. 1988); *O'Connell v. Walt Disney World Co.*, 413 So. 2d 444 (Fla. App. 1982); *Goyings v. Jack and Ruth Eckerd Found.*, 403 So. 2d 1144 (Fla. App. 1981).

In *Madison*, the court held that a release barred a plaintiff's wrongful death action premised on the defendants' negligence during a scuba-diving course. The release at issue in *Madison*, however, clearly stated that the releasor agreed not to sue if he suffered injury caused "by the negligence of" the releasees, and that the releasor agreed to "exempt and relieve [releasees] from liability for personal injury, property damage or wrongful death caused by negligence." 250 Cal. Rptr. at 302 (quote in lower case). In upholding the release, the court wrote that "[a]s long as the release constitutes a clear and unequivocal waiver *with specific reference to a defendant's negligence*, it will be sufficient." *Id.* at 304 (emphasis added).

Florida agrees with the California analysis. In *Goyings*, for example, the court wrote, "an exculpatory clause, while not favored, may operate to absolve a defendant from liability arising out of his own negligent acts. For such a clause to be effective, however it must clearly state that it releases the party from liability for his own negligence." 403 So. 2d at 1146.

Under the language of the release signed by Ito, we are not satisfied that, in signing the release, he "expressly agree[d]" to accept the risks, arising from defendants' negligence or reckless conduct, which caused his death. The release fails to set forth any express language as to defendants' negligence.

### B. *Applying a Less-Restrictive Standard under § 496B*

Some state jurisdictions have held that a release need not contain specific reference that the releasor is to assume the risk of harm arising from the releasee's negligent or reckless conduct. *Heil Valley Ranch, Inc.*, 784 P.2d at 784; *Blide v. Rainier Mountaineering, Inc.*, 636 P.2d 492, 493 (Wash. App. 1981), *review denied*, 96 Wash. 2d 1027 (1982); *Schutkowski*, 725 P.2d at 1061. Where that is the case, however, the release must

be "clear that the parties' intent was to release [defendants] from liability for negligence." *Schutkowski*, 725 P.2d at 1061.

If we were to disregard a strict interpretation of the requirements of § 496B and apply *Schutkowski's* less-restrictive standard to the release signed by Ito, the release would still not meet that standard because the only risks of harm which the release covered were those arising from *Ito's conduct*, not the risk of harm arising from defendants' negligence. The release alerted Ito that he could be injured if *he* failed "TO ABIDE BY THE RULES AND REGULATION SET BY THE GUIDES AND INSTRUCTORS," or if he were to "NEGLECT THE DIVING RULES."[9]

We fail to see how these warnings regarding injury arising from *Ito's* failure to follow diving rules and regulations could be satisfactorily construed to mean that he intended "to release [defendants] from liability for [their] negligence." *Schutkowski*, 725 P.2d at 1061. The release as drafted and signed by Ito simply was not "clear" regarding the parties' intent. Thus, even if we read the release broadly, we still have difficulty construing the language of the release as containing an intent to absolve the releasees from *their* negligence.

## C. The Effect of Comment d

Yamagishi and Hirai contend that comment d to § 496B supports a ruling that the release exonerated them from liability. However, we are not convinced that if we apply the test implicit in comment d we would reach a different result.

Comment d provides that a "general clause[] . . . will *not be construed* to include loss or damage resulting from [a defendant's] intentional, negligent, or reckless misconduct *unless the circumstances clearly indicate* that such was the plaintiff's understanding and intention." (Emphasis added.) Thus, where a general clause is used in the release, as in this case, the rule is that courts may not construe it to release a defendant from liability unless "the circumstances clearly indicate that such was the plaintiff's understanding and intention."

Here, again, the general clause released the defendants from liability if Ito's death was caused by Ito's (1) failure to abide by the rules and regulations set by the guides and instructors, and (2) neglect of diving rules.

The general clause of the release provides:

IN CASE OF ACCIDENT, CAUSING INJURY OR DEATH TO MYSELF, I MYSELF, MY FAMILY, OR INHERITED ORGANIZATION AND OTHER RELATED PERSONNEL SHALL HAVE NO RIGHT TO PROTEST AGAINST NOR TO CLAIM FOR DAMAGES.

This clause, when read together with the preceding sentences, does not "clearly indicate" that Ito understood or intended to release defendants from their negligence. For the reasons stated, even under comment d, we do not read the release's "general clause" to exempt the negligent defendants from liability.

## D. The Release Failed to Exonerate the Defendants

■ The release at issue in this case does not meet the requirements of § 496B. We hold that a release, in order to be valid, at the very least must expressly mention that the releasor is assuming the risk of harm that may arise from the releasee's negligence or reckless conduct. Because the release which Ito signed did not comply with this requirement, we conclude as a matter of law that Ito did not "expressly agree[] to accept a risk of harm arising from the defendant[s'] negligent or reckless conduct." Section 496B. The trial court thus erred in ruling that the release exonerated defendants Macro Energy, Inc. (the named releasee) and its alleged alter-ego MOE. Both Macro and MOE, as well as their agents/employees Yamagishi and Hirai, were not exempted from liability by operation of the release.

■ The plaintiff asserted liability against Macro on the theory of respondeat superior. Ito's Supplemental Brief at 3. Macro is liable for the negligence of its employees and/or agents, Hirai and Yamagishi, unless they were "acting outside the scope of their employment" during the course of events that caused Ito's death. RESTATEMENT (SECOND) OF AGENCY § 219 (1958).

■ The plaintiff's complaint alleged that Hirai was employed by and Yamagishi was "an officer, director and/or employee" of Macro at the time the incident took place. Complaint ¶¶ 6 and 7. Macro, Hirai and Yamagishi filed a joint answer and did not deny these allegations. Moreover, their joint answer did not set forth an affirmative defense that Hirai and Yamagishi "acted outside the scope of their employment." And, Macro's briefs on appeal do not assert such a defense, only the same defenses of Hirai and Yamagishi which were resolved against them by the trial court and, as set forth

---

[9] The trial court found that it was the *defendants* who did not abide by the rules of proper training, supervision and rescue. *See* Findings of Fact [hereinafter "Findings of Fact"] nos. 13-18, *Ito v. Macro Energy, Inc.*, Civ. No. 89-0918 (N.M.I. Super Ct. June 22, 1992).

below, by this Court. Thus, we hold, as a matter of law, that Macro is subject to joint and several liability on the judgment.

We shall therefore remand the matter to the trial court for the limited purposes of (1) entering judgment against Macro, Yamagishi and Hirai, jointly and severally, in the amount of $2,434,857.55 and (2) determining whether MOE should also be held jointly and severally liable to the plaintiff for the same monetary judgment, based on the theory that MOE is the "alter ego" of Macro.

## 2. Ito's Implied Assumption of Risk

Defendants alternatively argue that if the release is not valid, Ito impliedly assumed the risk of harm arising from defendants' conduct. They contend that the risk of drowning is so inherent in the sport of scuba diving that Ito must have impliedly assumed that risk by participating in the diving excursion.

The doctrine of implied assumption of risk, as contained in RESTATEMENT (SECOND) OF TORTS § 496C (1965) (hereinafter "§ 496C"), states, in pertinent part:

> (1) Except as stated in Subsection (2), a plaintiff who fully understands a risk of harm to himself . . . caused by the defendant's conduct . . . and who nevertheless voluntarily chooses to enter or remain, . . . under circumstances that manifest his willingness to accept it, is not entitled to recover for harm within that risk.
>
> (2) The rule stated in Subsection (1) does not apply in any situation in which an express agreement to accept the risk would be invalid as contrary to public policy.

The plaintiff argues that § 496C(1) is inapplicable because the release is "invalid as contrary to public policy" under § 496C(2). In support, she points to the trial court's finding that "Yamagishi deceived Ito into believing that he was receiving the legitimate CMAS one star course and a legitimate open water diver course." Finding of Fact no. 16, *supra*. We have already ruled that the release failed because it did not comply with the express requirements of § 496B, not because accepting such risk would be contrary to public policy. We shall therefore address the issue of whether Ito impliedly assumed the risk of harm arising from defendants' conduct.

Under § 496C(1), Ito's implied assumption of the risk must have been voluntarily made, with his full understanding of the risk of harm resulting from defen-

dants' conduct. There is no dispute that Ito voluntarily chose to go diving. The issue, however, is whether Ito had knowledge of, and understood the risk of harm caused by defendants' conduct. RESTATEMENT (SECOND) OF TORTS § 496D (1965) (hereinafter "§ 496D") provides guidance in determining what level of knowledge a person must possess in order to impliedly assume the risk of harm arising from defendants' conduct. *See* § 496C cmt. a. Section 496D states: "Except where he expressly so agrees, a plaintiff does not assume a risk of harm arising from the defendant's conduct unless he then knows of the existence of the risk and appreciates its unreasonable character."[10]

Defendants argue that Ito knew he could drown in water if he were to go scuba diving. *See id.* cmt. d. That is true. However, the "risk of harm" which we must examine is that "arising from the defendant[s'] conduct." Section 496D. We need not examine any and all risks which could occur on a dive, such as drowning, a shark bite, or jellyfish sting.

Under § 496D, Ito must have known of the existence of the risk and appreciated its unreasonable character to have impliedly assumed the risk. This meant that Ito "must not only [have been] aware of the facts which create[d] the danger, but must also [have] appreciate[d] the danger itself and the nature, character, and extent which [made] it unreasonable." *Id.* cmt. b. Whether Ito was aware of and appreciated the dangers are questions of fact. *See id.* cmt. e.

After a two week trial, the court found as a matter of fact that "Ito was not aware of all the risks of scuba diving . . . because he had not been properly trained." It also found that Ito's poor training "was a proximate cause of [his] death." *See* Findings of Fact no. 17 and 18, *supra*.

Although the trial court found that Ito "was not aware of all the risks of scuba diving," we cannot say with certainty whether he was likewise not aware of the specific risks which could arise from defendants' conduct. Nothing in the facts of this case indicates that Ito had any warning that defendants might be negligent in performing their duties.

There are no facts indicating that Ito knew of the existence of the risk arising from defendants' conduct or that he "appreciate[d] its unreasonable character." Section 496D. Therefore, we hold that Ito did not impliedly assume the risk arising from defendants' conduct because he did not "fully" understand the "risk of

---

[10] Again, we note that because the release used by the defendants was invalid, Ito did not "expressly agree" to assume the risk of harm arising from the defendants' conduct.

58

harm to himself . . . caused by the defendant[s'] conduct" as required under § 496C.

## 3. Ito's Contributory Negligence

Defendants also argue that Ito was contributorily negligent as a matter of law because he failed to take reasonable precautions before encountering the risks of diving. According to Hirai, Ito failed to ask how long the dive would take and to find out what he should do if he and his dive buddy became separated. Defendants Macro and Yamagishi allege that Ito's death was caused by his violation of basic scuba diving rules and that Ito had the "last clear chance" to prevent his own death.

■ Contributory negligence is defined in RESTATEMENT (SECOND) OF TORTS § 463 (1965) (hereinafter "§ 463") as follows: "Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, and which is a legally contributing cause co-operating with the negligence of the defendant in bringing about the plaintiff's harm."

■ To conclude that Ito was contributorily negligent under § 463, we conduct a two-step test. First, we must find that Ito did not observe the proper standard of conduct for his own safety. According to RESTATEMENT (SECOND) OF TORTS § 464(1) (1965) (hereinafter "§ 464(1)"), "the standard of conduct to which [a reasonable person] must conform for his own protection is that of a reasonable [person] under like circumstances."

*Only if* we find that Ito's conduct did not meet this 'reasonable person' standard may we move on to the second part of the test, which is whether Ito's conduct legally contributed to his death. In conducting this analysis, we may find that Ito's own negligence was "a legally contributing cause of his harm if, but only if, it [was] a substantial factor in bringing about his harm and there is no rule restricting his responsibility for it." RESTATEMENT (SECOND) OF TORTS § 465(1) (1965).

■ We do not reach the second part of the test, however, because the facts show that Ito's conduct conformed to that of "a reasonable [person] under like circumstances." Section 464(1). Ito took defendants' diving course. The trial court did not find from the evidence that Ito was negligent in the manner he conducted himself.

Defendants' assertion that Ito was negligent in failing to ask questions about the dive's depth, duration, course, and emergency procedures does not have merit. *See* Hirai's Opening Brief at 41. Defendants had the duty to provide this information to Ito and the other divers, not the other way around: "Yamagishi and Hirai failed to discuss with Ito the special circumstances of a dive to more than 100 feet, including the more rapid exhaustion of air and nitrogen narcosis." Also, "[a]t the site of the Grotto, Yamagishi and Hirai failed to give an adequate dive briefing and failed to check Ito's equipment." *See* Findings of Fact nos. 31 and 32, *supra*.[11]

Defendants held themselves as professional dive instructors and supervisors. Ito reasonably relied on their representation of professionalism when he registered to learn how to dive from them, and subsequently when he decided to dive at the Grotto under their professional supervision. Ito paid for defendants' expert services. He had a right to expect that they would provide him with all important pre-dive information and conduct any last minute equipment checks that would be necessary. Defendants failed to do so.

It was the defendants who failed in their duty to Ito. Ito acted as a reasonable person would have under the circumstances. We, therefore, hold that Ito was not contributorily negligent under § 463.

## 4. The Standard of Care for Diving

■ Defendants argue that the trial court applied an incorrect standard of care in evaluating their conduct. They argue that the trial court erred because it measured their conduct "against a foreign standard of care rather than the prevailing standard of care in the Commonwealth." *See* Hirai's Opening Brief at 32; Yamagishi's Opening Brief at 34 (quote in lower case).

The trial court heard testimony by the plaintiff's and defendants' dive experts, and subsequently found that Macro's diving course "did not meet the minimum standards" and "did not meet the standards or follow the training program required by CMAS." Findings of Fact nos. 10 and 13, *supra*. The trial court, therefore, applied a standard premised upon the CMAS requirements for dive certification. Defendants contend, however, that their conduct should be "adjudged according to the ADS[12] standard adhered to by scuba diving shops throughout the community of Saipan." *See* Yamagishi's Reply Brief at 20 (quote in lower case).

We reject defendants' contention for three reasons. First, defendants purported to certify Ito under the ADS

---

[11] The trial court also found that "Yamagishi led the dive to a depth of more than 100 [feet] far beyond the training capabilities of Ito." Findings of Fact, *supra*, note 9, no. 34.

[12] ADS is a Japanese dive organization and is a member of CMAS, an internationally recognized French dive agency. Reporter's Transcript vol. III at 225-26.

*and* CMAS standards. The trial court found that defendant Yamagishi had "signed a certification card certifying Ito as an ADS open water diver" and "signed a certification card certifying Ito as a CMAS one-star diver."[13] Findings of Fact nos. 6 and 7, *supra.*

Defendants may not now contend that, although they purported to certify Ito under the CMAS standard, the trial court should have adjudged Macro's training course under a different "Saipan-only" standard. Defendants may not purport to offer one standard of dive instruction to its students, and subsequently argue that the trial court erred by not applying an apparently lower level standard in evaluating their dive course. The trial court correctly applied the standard which defendants themselves purported to offer Ito: CMAS.

Second, there apparently is *no* ADS "standard" for dive courses or other diving requirements. Defendants' own dive expert testified that he was "not familiar with any [ADS standard]" and that ADS "refer[s] to the CMAS standard."[14] In light of this, we cannot say that the trial court erred in applying the CMAS standard.

Lastly, we disagree with defendants' contention that there is, or should be, a unique standard for Saipan dive shops and professionals. Defendants argue that—although there is no ADS standard—there exists an "ADS standard adhered to by scuba diving shops throughout the community of Saipan." Yamagishi's Reply Brief at 20 (quote in lower case). However, defendants fail to state what sort of diving requirements and skills do or should comprise such a Saipan-only standard, even though their expert arguably "was and is intimately familiar with the standards of the scuba diving industry in the Commonwealth and throughout Micronesia." Hirai's Opening Brief at 39.

Defendants rely on RESTATEMENT (SECOND) OF TORTS § 299A (1965), which provides:

> Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.

For some professions, an "[a]llowance must be made . . . for the type of community in which the actor carries on his practice." *Id.* cmt. g. For example, "[a] country doctor cannot be expected to have the equipment, facilities, experience, knowledge or opportunity to obtain it, afforded him by a large city." *Id.* However, this flexibility is not available to all professions. Comment g continues:

> In other professions, such as that of the attorney, such variations either do not exist or are not as significant, and allowance for them has seldom been made. A particular profession may be so uniform, in different localities, as to the skill and knowledge of its members, that the court will not feel required to instruct the jury that it must make such allowance.

The CMAS standard which the trial court applied is internationally recognized.[15] The trial court found that:

> CMAS has specific standards which describe the knowledge and skills required in order for a diver to be granted a CMAS one-star diver certificate.
> CMAS has a diver training program which indicates the current standard of training necessary in order to reach the minimum level of proficiency required for the award of a CMAS one-star diver certificate.

Findings of Fact nos. 11 and 12, *supra.*

The trial court was not persuaded that an allowance should be made for local "variations" in the requisite skills of a scuba diving professional. Rather, it accepted the approach of the plaintiff's dive expert who, in his evaluation of Macro's dive course, "measured it against

---

[13] In fact, "[t]he course that Ito attended to receive his open water certification did not meet the standards or follow the training program required by CMAS." Findings of Fact, *supra* note 9, no. 13.

[14] *See* Reporter's Transcript vol. XIII at 1006-07, *quoted in* Ito's Response Brief at 31-32. Yamagishi, on the other hand, states that the alleged ADS standard is "based in part on the CMAS standard" as "established and adhered to by the dive shops throughout Saipan." Yamagishi's Reply Brief at 22-23.

[15] "CMAS is a French agency which is internationally recognized around the world and issues a card certifying a diver as a CMAS one-star diver." Findings of Fact, *supra* note 9, no. 7.

what is considered to be normal by the five major training agencies in the world."[16]

The trial court concluded that "Yamagishi did not exercise reasonable care as a scuba instructor in certifying Ito as an open water diver and a CMAS one star diver." Finding of Fact no. 14, *supra*. This determination is supported by the evidence. *See Martinez v. Asarco, Inc.*, 918 F.2d 1467, 1471 (9th Cir. 1990) (what duty is owed plaintiff is question of law for the court, but whether defendant breached that duty is ordinarily reserved for the trier of fact). There is no reason why the court should apply a standard different from that which defendants offered Ito: CMAS. We hold that the trial court applied the correct standard of care in evaluating defendants' conduct.[17]

## 5. The Plaintiff-Hirai Settlement Agreement

On June 21, 1991, the plaintiff offered to settle with defendant Hirai. Hirai claims he "unconditionally accepted" the offer on June 25, 1991. A day later, on June 26, the plaintiff's counsel orally revoked the offer and, on June 27, sent a letter confirming withdrawal of the offer.

On September 12, 1991, Hirai filed a "Motion For Enforcement of Settlement Agreement." On May 22, 1992, the plaintiff filed a "Pretrial Statement" in which she noted that Hirai's motion to enforce the settlement agreement was filed but never set for hearing. On May 26, 1992, the first day of trial and just prior to counsels' opening statements, counsel for Hirai sought to argue the motion, but the trial court refused to hear it.

Hirai argues that the trial court abused its discretion in not hearing the motion for two reasons. First, Hirai argues that as a defendant he could bring his motion, which he contends was for summary judgment, "at any time." Com. R. Civ. P. 56(b). Hirai interprets this to mean "including on the eve of, or even during trial." Hirai's Opening Brief at 44. As Hirai notes, some courts have allowed a defendant to bring a summary judgment motion on the eve of trial. For example, in *H.J. Heinz*

*Co. v. Beech-Nut Life Savers, Inc.*, 181 F. Supp. 452 (S.D.N.Y. 1960), the trial court allowed defendants to bring their summary judgment motion "on eve of trial," because such "may well have the salutary effect of narrowing the issues for trial." *Id.* at 459. In this case, however, Hirai's dismissal would not have "narrow[ed] the issues for trial."

The trial court possesses inherent power to police its docket. *Oliva v. Sullivan*, 958 F.2d 272 (9th Cir. 1992); *Edwards, supra*. The timing of trials and docket control are matters best left to the discretion of the trial court. *Coursen v. A.H. Robins Co., Inc.*, 764 F.2d 1329 (9th Cir. 1985), *corrected by* 773 F.2d 1049.

The trial court did not abuse its discretion in not hearing Hirai's motion for summary judgment on the day of trial. Hearing the motion would have entailed continuing the trial to another day. A continuance would have required a shifting of the court's docket. Under the circumstances, we do not find an abuse of discretion by the trial court since the issue involved the court's control over its docket.

Hirai also argues that once a valid settlement is reached, the court's duty is to effectuate the intentions of the parties. This argument, however, addresses the underlying substantive issue of whether the settlement agreement was valid and enforceable as a matter of law. Since the trial court, however, made no ruling on the merits of this issue, we need not address it.

## 6. The Plaintiff's Claim for Loss of Consortium

American Home brought a motion for summary judgment relating to the coverage limits under its insurance policy. In ruling on this motion, the trial court stated that "[p]laintiff admits, through her attorney, that she is no longer pursuing a claim for loss of consortium." *See Ito v. Macro Energy, Inc.*, Civ. No. 89-0918 (N.M.I. Super. Ct. Apr. 16, 1991) (Memorandum Opinion at 7).

We agree with the plaintiff's contention that the court erred in dismissing her claim based on her alleged waiver of such claim. We disagree, however, that she and her children are entitled to loss of consortium damages here.

Whether a claim for loss of consortium is considered derivative of a wrongful death claim or not, the common law does not recognize a cause of action for post-mortem loss of consortium. *Ladd v. Douglas Trucking Co.*, 523 A.2d 1301 (Conn. 1987); *Audubon-Exira Ready Mix, Inc. v. Illinois Cent. Gulf R.R. Co.*, 335 N.W.2d 148 (Iowa 1983); *Selchert v. Lien*, 371 N.W.2d 791 (S.D. 1985); *Long v. Dugan*, 788 P.2d 1

---

[16] Reporter's Transcript vol. VIII at 625:6-8. Also, the trial court found that "[t]he course that Ito attended to receive his open water certification did not meet the standards or follow the training program required by CMAS." Findings of Fact, *supra* note 9, no. 13.

[17] We do not imply that any diving standard which defendants may have offered would be acceptable. CMAS, which is one of the world's major dive training agencies, qualifies as an acceptable standard in the Commonwealth.

(Wash. App. 1990), *review denied*, 791 P.2d 536. Instead, a jurisdiction's wrongful death statute usually provides the exclusive remedy for the decedent's beneficiaries. *Millican v. Wolfe*, 701 P.2d 107, 109 (Colo. App. 1985), *cert. dismissed*, 726 P.2d 647 (1986); *Ladd*, 523 A.2d at 1305; *Selchert*, 371 N.W.2d at 794. A deceased's spouse and children may recover for losses attributable to loss of love, affection and guidance, but only if there is a statute that permits such recovery.

In a well-reasoned opinion, *Reed v. Pacific Intermountain Express Co.*, 597 F. Supp. 42 (D. Conn. 1984), the court precluded the plaintiff from recovering damages for loss of consortium after the death of her spouse. While acknowledging the policy reasons in favor of allowing the claim to proceed, it declined to do so because the Connecticut Legislature failed to provide for loss of consortium recovery pursuant to its wrongful death statute. "[I]t is logical to assume that the passage of a wrongful death statute, creating a right of recovery unknown to the common law, was intended to preclude further judicial initiative." *Id.*, 597 F. Supp. at 45 (citing *Justus v. Atchison*, 565 P.2d 122, 128 (Cal. 1977), *overruled on other grounds*, *Ochoa v. Superior Ct.*, 703 P.2d 1, 9 (Cal. 1985)). On certification from the U.S. District Court,[18] the Connecticut Supreme Court agreed with *Reed* and declined to recognize a right of recovery for post-mortem loss of consortium. *Ladd*, *supra*.[19]

RESTATEMENT (SECOND) OF TORTS § 925 (1979) provides: "The measure of damages for causing the death of another depends upon the wording of the statute creating the right of action and its interpretation."

RESTATEMENT (SECOND) OF TORTS § 693 (1977) provides the rule for a spouse's right to recover for loss of society and services. Comment f explains that

> In the case of death resulting to the impaired spouse, the deprived spouse may recover under the rule stated in this Section only for harm to his or her interests and expense incurred between the injury and death. For any loss sustained as a result of the death of the impaired

spouse, the other spouse *must recover, if at all, under a wrongful death statute*.

(Emphasis added.)

▇ Because the Commonwealth Legislature has provided a statutory remedy for the beneficiaries of the victim of a wrongful death, we are not at liberty to create a right of action, not recognized at common law, for post-mortem loss of consortium in favor of the surviving spouse and children. Therefore, we go on to review our statute to determine whether it allows recovery for loss of consortium *as an element* of damages recoverable under our wrongful death statute. If it does, the court erred in precluding consideration of the alleged loss. If it does not, then the dismissal of the claim for loss of consortium was correct, but for the wrong reason.

Seven CMC §§ 2101-2103 provide that a decedent's personal representative may recover damages on behalf of the decedent's beneficiaries for wrongful death. Seven CMC § 2101(a) provides:

> When the death of a person is caused by wrongful act, neglect or default such as would have entitled the party injured to maintain an action and recover damages in respect thereof if death had not ensued, . . . the [party] which would have been liable if death had not ensued . . . is liable to an action for damages notwithstanding the death of the person injured . . . .

Seven CMC § 2103 provides, in part: "[T]he Court may award damages as it may think proportioned to the pecuniary injury resulting from the death, to the persons for whose benefit the action was brought."

Our wrongful death statute stems from and is substantially the same as the Trust Territory wrongful death statute. *See* 6 TTC §§ 201-203. The Trust Territory High Court determined that this statute was fashioned after England's "Lord Campbell's Act,"[20] meaning that "damages are limited to the pecuniary benefits which the beneficiaries might reasonably be expected to have derived from the deceased had his life not been terminated." *Ychitaro v. Lotius*, 3 TTR 3, 17 (Trial Div. 1965); *see also Sepeti v. Fitek*, 5 TTR 613, 615 (Trial Div. 1972).

---

[18] *Hume v. Hertz Corp.*, 628 F. Supp. 763 (D. Conn. 1986).

[19] Connecticut's wrongful death statute is not based on Lord Campbell's Act, as is 7 CMC § 2101 et seq. *See* discussion *infra*. Nevertheless, the *Ladd* court found that the legislature had fashioned the remedy for wrongful death in Connecticut. Loss of consortium was not a recoverable loss. Therefore, the court held that the only body which could provide a remedy for loss of consortium was the legislature.

[20] *See*, for example, *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573, 580 n.6, 94 S. Ct. 806, 812 n.6, 39 L. Ed. 2d 9, 18 n.6 (1974) (*superseded by statute*, *Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S. Ct. 317, 112 L. Ed. 2d 275 (1990)), where the Court sets forth Lord Campbell's Act, 9 & 10 Vict., c. 93, "An Act for compensating the Families of Persons killed by Accidents (Aug. 26, 1846)."

The Trust Territory High Court followed what the majority of states have adopted as the measure of damages applied in wrongful death actions: the "loss to dependents" measure. Dan B. Dobbs, LAW OF REMEDIES [hereinafter "Dobbs"], § 8.4(3) (2d ed. 1993), citing at n.6 *Freeman v. Davidson*, 768 P.2d 885 (Nev. 1989); *Calhoun v. Blakely*, 564 A.2d 590 (Vt. 1989). These damages are "measured by the support and amenities lost by the victim's dependents or beneficiaries . . . [c]ontributions made by the deceased from earnings or even from pension income reflect the loss under this measure." Dobbs, *supra*, § 8.3(4). Whether loss of consortium damages are recoverable in the Commonwealth under this calculus is the issue we must answer.

Historically, wrongful death damages were limited to "pecuniary" losses. *Id.* § 8.3(5). As such, damages for loss of love and affection were not recoverable. *Id.*, citing at n.1 *Miller v. Mayberry*, 506 N.E.2d 7 (Ind. 1987) (action for wrongful death of child). The purpose of the pecuniary loss rule was to prevent "extravagant" jury verdicts based on "sad emotions and injured feelings" instead of actual pecuniary loss. *Krouse v. Graham*, 562 P.2d 1022, 1026 (Cal. 1977).

Yet, "[m]ost jurisdictions now recognize the 'consortium' recovery for lost companionship, society, love, advice and guidance, either because those elements are considered 'pecuniary loss,' or because the statute specifically permits their recovery, or because the court has judicially discarded the 'pecuniary loss' limitation." Dobbs, *supra*, § 8.3(5) (footnotes omitted).[21]

For example, the California Supreme Court in *Krouse, supra,* interpreted its wrongful death statute to allow the deceased's spouse to recover for the loss of his wife's "love, companionship, comfort, affection, society, solace or moral support [and] any loss of enjoyment of sexual relations." *Id.*, 562 P.2d at 1024.[22] It noted that

"if damages were truly limited to 'pecuniary' loss, recovery frequently would be barred." *Id.*, 562 P.2d at 1026. Notwithstanding, we are constrained by the language of our statute.

■ The Commonwealth's wrongful death statute grants a cause of action vested in the decedent's personal representative. This cause of action creates a right to relief for damages caused to the "party [fatally] injured." The statute does not provide a right to relief for derivative injuries, such as loss of consortium, to the adult decedent's surviving spouse or children.

■ Loss of consortium is a claim for damages suffered by the non-injured spouse.[23] Our wrongful death statute allows only for recovery to the "party injured," that is, the deceased—not his spouse or children. *See Hunt v. Evenoff*, 829 P.2d 1051, 1052 (Or. App. 1992), *review denied*, 836 P.2d 1344 ("[a] wrongful death action may be maintained only under circumstances in which 'the decedent might have maintained an action, had the decedent lived[,]' ORS 30.020(1)"). Thus, the plaintiff's claim that she, as Ito's wife, and her children are entitled to damages based on loss of consortium fails. Our conclusion is fortified by the 1984 amendment to 7 CMC § 2103[24] which eliminated the former $100,000 recovery limitation for wrongful death actions in the Commonwealth. The amendment indicates to us that until our statute is further amended to permit recovery of damages for loss of parental and/or spousal consortium, the legislature apparently intends that such damages should remain unrecoverable. The plaintiff's loss of consortium claim therefore has no statutory basis, and the dismissal of the claim, although made for the wrong reason below, shall stand.

---

[21] In a 1974 case, the Supreme Court noted that "27 of the 44 state and territorial wrongful-death statutes which measure damages by the loss sustained by the beneficiaries, permit recovery for loss of society. . . . California, Delaware, Michigan, Minnesota, Montana, Pennsylvania, Texas and the Virgin Islands, which either expressly or by judicial construction limit recovery to pecuniary losses have been judicially interpreted, nevertheless, to permit recovery for the pecuniary value of the decedent's society." *Sea-Land Services, Inc.*, 414 U.S. at 587, n.21, 94 S. Ct. at 816, n.21, 39 L. Ed. 2d at 22, n.21.

[22] California Code of Civil Procedure § 377 provides for recovery in a wrongful death action for damages which are "just." Yet, the California courts allowed recovery of only "pecuniary losses" in a wrongful death action. *Krouse v. Graham*, 562 P.2d 1022 (Cal. 1977). The California Supreme

Court labeled damages for loss of "society, comfort and protection" as "non-pecuniary" because they did not have an "ascertainable economic value." *In re Air Crash Disaster near Cerritos, Cal.*, 982 F.2d 1271, 1278 (9th Cir. 1992). Nevertheless, such damages are recoverable if they have pecuniary value. *Krouse*, 562 P.2d at 1025-26.

[23] The *injured* spouse has no claim for loss of consortium. *Atkins v. Strayhorn*, 273 Cal. Rptr. 231, 239 (Ct. App. 1990) (loss of consortium is a separate claim from a spouse's claim for personal injury). Similarly, assuming that we recognized a separate cause of action for loss of *parental* consortium for children, the cause would lie with the surviving children, not the injured or deceased parent.

[24] PL 4-16 (effective Oct. 24, 1984). *See* Law Revision Commission Comment to 7 CMC § 2103.

## 7. The Trial Court's Calculation of Damages

The trial court awarded the plaintiff damages of $2,389,857.55 (plus burial expenses). Specifically, the trial court found that "[t]he income that [Ito] could have been expected to provide to his wife and children over his working life reduced to present value at an exchange rate of -126.78/$ is $2,389,857.55." *See* Findings of Fact no. 72, *supra*.

Defendants argue that the trial court erred in two respects. First, the court failed to explain the approach it applied in calculating the plaintiff's damages. Second, the court's actual calculation of damages is erroneous.

The two cases relied upon by defendants to support their argument that the trial court must explain its approach in calculating damages, *Shaw v. United States*, 741 F.2d 1202 (9th Cir. 1984), and *Trevino v. United States*, 804 F.2d 1512 (9th Cir. 1986), *cert. denied*, 484 U.S. 816, 108 S. Ct. 70, 98 L. Ed. 2d 34 (1987), were appeals involving allegedly "excessive" damage awards received by plaintiffs under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq. (hereinafter "FTCA"). In both *Shaw* and *Trevino*, the Ninth Circuit held that damage awards under the FTCA are reviewed for "clear error." *Trevino*, 804 F.2d at 1514-15; *Shaw*, 741 F.2d at 1205.

■ The trial court's determination regarding damages was a finding of fact, and, as such, "shall not be set aside unless clearly erroneous." Com. R. Civ. P. 52(a); *Reyes, supra*. Regarding the application of the clearly erroneous standard to damage awards, the court in *Trevino*, citing *Shaw*, 741 F.2d at 1205, opined:

> The award is clearly erroneous if, after a review of the record, we are "'left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *United States v. United States Gypsum Co.*, [333 U.S. 364, 395, 68 S. Ct. 525, 542, 97 L. Ed. 746] (1948)). To determine whether a given award is excessive, we look to the relevant state's case law on excessive awards. *Id.* The state of Washington considers awards excessive "only if the amount shocks the court's sense of justice or sound judgment" and if it "appears that the trial judge was swayed by passion or prejudice." *Id.* at 1209. To make that determination, we compare the challenged award to awards in similar cases in the same jurisdiction. *Id.* The choice of a discount rate, used to adjust to present value an award based on an income stream spread over time and, at the same time, to adjust for the

effects of inflation, should be reviewed for an abuse of discretion.

*Trevino*, 804 F.2d at 1515.

■ There is no Commonwealth case respecting excessive damage awards. We agree, however, with the approach taken by the courts of Washington State that a damage award should be considered excessive only if the amount shocks the court's sense of justice or sound judgment. *Harvey v. Wight*, 412 P.2d 335, 337-38 (Wash. 1966). We will also look to insure that the trial judge was not swayed by passion or prejudice. *Shaw*, 741 F.2d at 1209. If the damage award passes these subjective tests, then we will review for an abuse of discretion the trial court's choice of a discount rate, inflation rate, and any other figures used in calculating a present value award. *Trevino*, 804 F.2d at 1515. With these guidelines in place, we now turn to defendants' specific contentions regarding the damages awarded in this case.

First, defendants contend that the trial court erred in not revealing the figures it used to calculate the damage award. However, defendants acknowledge that the figures used by the trial court were "adopted verbatim from paragraph 70 of Plaintiff's Proposed Findings of Fact, and it is no surprise that both arrived at a figure of $2,389,857.55." Yamagishi's Opening Brief at 44-45.

The Ninth Circuit has criticized the adoption by the federal district courts of a party's proposed findings, and has stated that this practice requires "close scrutiny." *See Stead Motors of Walnut Creek v. Automotive Machinists Lodge No. 1173, Int'l Ass'n of Machinist & Aerospace Workers*, 886 F.2d 1200, 1204 n.5 (9th Cir. 1989) (en banc). In this case, however, it was the defendants who had the opportunity, but failed, to closely scrutinize the figures used by the plaintiff's expert and, later, by the trial court. The plaintiff provided defendants with the name of her damages expert, Dr. Joseph L. Tryon, ten months prior to trial. Dr. Tryon was deposed in April 1992, over a month prior to trial, in lieu of his live testimony. The defendants therefore had Dr. Tryon's testimony in advance of trial. Indeed, at trial, the defendants' damages expert attacked the figures used by Dr. Tryon, and in this appeal attack those same figures.

Given these facts and circumstances, we cannot say that the figures and method of calculating damages used by the trial court in determining damages were not known to the defendants. The trial court's figures and calculations were not shrouded in mystery, but rather were the subject of debate in open court. The defendants were aware at all relevant times of the figures and calculations used by Dr. Tryon, and will not now be heard to say that the trial court's adoption of those same

figures means that the defendants have not been properly apprised of the figures or the court's method of calculating the damage award.

Second, the defendants contend that the trial court's damage award is excessive and clearly erroneous. *See* Yamagishi's Opening Brief at 43. We do not find the trial court's damage award to be so excessive that it shocks our sense of justice or sound judgment. *Harvey*, 412 P.2d at 337-338. Also, we find nothing in the record which evidences that the trial judge was swayed by passion or prejudice. *Shaw*, 741 F.2d at 1209. Therefore, we will review the trial court's choice of figures in calculating the present value award for an abuse of discretion. *Trevino*, 804 F.2d at 1515.

The defendants essentially attack the twenty-one year time frame (1969-1990) used by Dr. Tryon (and followed by the trial court) to calculate a Japanese inflation rate of 9.46%. The defendants contend that this rate is too high and not reflective of the contemporary Japanese economy.[25]

■ We therefore must determine whether the trial court abused its discretion in using the time frame and the resulting inflation rate suggested by Dr. Tryon. Trevino, 804 F.2d at 1515. In applying an abuse of discretion standard, we look to determine whether there has been manifest or gross abuse of discretion by the trial court. *Robinson v. Robinson*, 1 N.M.I. 81 (1990).

Defendant Yamagishi notes:

> In his deposition, Dr. Tryon appeared to take Ito's salary in 1988 and increase it by 9.46% each year and every year until the year 2012, a twenty-four year period, to conclude that Ito's lost wages, less personal consumption expenses, would have amounted to $2,244,342.00, computed at an exchange rate of -135 to the dollar and discounted to present value using an interest rate of 7.14%.

Yamagishi's Opening Brief at 45.

This statement is not completely correct. Dr. Tryon calculated an annual inflation rate of 9.46% by looking to a twenty-one year average (1969-1990) of the Japanese "monthly earning index," which is "a combination of

inflation and productivity advances roughly comparable to a combination of the United States consumer price index and the average monthly wage index."[26]

The defendants argue that if Dr. Tryon had used a shorter, more recent time frame, e.g., the last six years, then the Japanese inflation rate would be about three percent, thereby reducing the damage award by approximately one million dollars. Yamagishi's Opening Brief at 45. The defendants cite *Trevino*, in which the court wrote that "it is impermissible to select a time period over which to compare inflation and interest rates that provides a decidedly aberrational result." *Trevino*, 804 F.2d at 1519.

The court in *Trevino* also wrote:

> We cannot deny history, nor can history provide an always reliable basis for predicting the future. However, we can base our estimates on long time periods that will diminish the effect of shorter aberrational periods. Fluctuations that are great for a short time span are less dramatic, and skew results less, when they are seen as part of a longer period. We have no confidence in the ability of experts, the district court, or this court, to predict inflation or interest rates over the period of [the plaintiff's] life other than extrapolating from the past.

*Id.* at 1518.

We agree with the defendants that, in the past few years, the Japanese economy has slowed, causing a decrease in the Japanese economic growth rates. However, like the court in *Trevino*, we deem the wiser approach is to look at the long term growth rates in order to "base our estimates on long time periods that will diminish the effect of shorter aberrational periods." *Id.*

■ Dr. Tryon and the trial court took such a long-term view, and used a time-reference of 1969-1990 to determine a Japanese inflation rate of 9.46%. While this rate of inflation may seem high by American standards,[27] the evidence shows it is reasonable when viewed in the economic context of the plaintiff's homeland: Japan. For

---

[25] RESTATEMENT (SECOND) OF TORTS § 913A (1979) states: "The measure of a lump-sum award for future pecuniary losses arising from a tort is the present worth of the full amount of the loss of what would have been received at the later time."

[26] Yamagishi's Opening Brief at 45, citing Reporter's Transcript vol. X at 782:1-13. Dr. Tryon used this rate of 9.46% even though his analysis of Ito's actual salary pattern over a twenty-year period showed that Ito's salary had actually increased by 12.62% per year. Ito's Response Brief at 39.

[27] The court in *Trevino* noted that between 1926 and 1981, the average annual inflation rate in the U.S. "was around 3 percent." *Trevino*, 804 F.2d at 1518, citing R. Ibbotson & R. Sinquefield, STOCKS, BONDS, BILLS, AND INFLATION 15 (1982 ed.).

these reasons, we hold that the trial court did not commit manifest or gross abuse of its discretion in using a time frame of 1969-1990 to determine (and apply in its calculations) an inflation rate of 9.46%.

## 8. American Home's Liability Under the Policy

On March 26, 1991, American Home filed a motion for summary judgment, arguing that the extent of its liability was limited to $100,000, the "per person" limit under the subject American Home policy. On April 16, 1991, the trial court declared that coverage for Ito's death under the policy was limited to $100,000, rather than $300,000, the "per accident" limit under the policy. The plaintiff and Yamagishi contend on appeal that the insurance policy limit is $300,000 for the plaintiff's claim of wrongful death. We disagree and find no error.

### A. *The American Home Policy*

The American Home insurance policy is a comprehensive general liability policy. At the center of this issue are two sections of the policy which relate to American Home's "limits of liability"—that is, the amount which American Home will pay to the insureds under the policy. The first is Endorsement No. 1 to the policy, which states, in pertinent part:

### LIMITS OF LIABILITY

It is hereby understood and agreed that the Limits of Liability of the Policy are as follows:

Bodily Injury: $ 100,000 - Per Person
$ 300,000 - Per Accident

The second is the following language from a standard form attached to the policy (hereinafter "section III"):

### III. LIMITS OF LIABILITY

Regardless of the number of (1) insureds under this policy, (2) persons or organizations who sustain bodily injury or property damage, or (3) claims made or suits brought on account of bodily injury or property damage, the company's [American Home's] liability is limited as follows:
Coverage A [for Bodily Injury Liability]—The total liability of the company for all

damages, including damages for care and loss of services, because of bodily injury sustained by one or more persons as the result of any one occurrence shall not exceed the limit of bodily injury liability stated in the schedule as applicable to "each occurrence."

(Emphasis omitted.)
As used in the policy, the term "occurrence" means an "accident."

### B. *The Appellants' Arguments*

Two arguments are raised on appeal. The first is presented by defendant Yamagishi.[28] He asserts that the policy is ambiguous as to the meaning of the term "per person" used in Endorsement No. 1. A reasonable construction of the term "per person" includes a person making a claim or bringing suit which arises from someone's bodily injury. Thus, the plaintiff and her two children would constitute three such "persons," making three claims arising from Ito's bodily injury, and the policy therefore provides a total of $300,000 in coverage—$100,000 for each of the three claims. Yamagishi's Opening Brief at 12. This argument was not made to the trial court and is not properly before us, although it is addressed pursuant to the second argument raised on appeal. *Estate of Stevenson v. Hollywood Bar & Cafe, Inc.*, 832 P.2d 718, 721 n.5 (Colo. 1992) (en banc).

The second argument is presented by the plaintiff, with whom defendant Yamagishi joined below. The plaintiff argues that the term "per person" is not defined in the policy. She also argues that section III is the only limitation in the policy regarding American Home's liability on a single claim, and that limitation is $300,000, not $100,000 as the trial court ruled.

The plaintiff argues here that the "per accident" limitation should apply because of an alleged ambiguity in the policy. Specifically, she contends that "since the main body of the policy has no reference to any limitation except $300,000 (per occurrence), the phrase 'per person' standing alone in the endorsement without any definition is meaningless or at a minimum, ambiguous." Ito's Opening Brief at 26.

The plaintiff has taken the position that the term "per person" and the attending limitation set forth in the endorsement should just be ignored. Alternatively, she suggests that the limiting term "per person" could mean A$100,000 per person insured, $100,000 per person

---

[28] For the insurance coverage issue only, defendant Yamagishi is represented by James H. Grizzard of Saipan.

making a claim, or even $100,000 [per] person suffering pecuniary loss just as easily as [the trial court's finding that the term means] $100,000 per person injured." *Id.* at 32.[29] We find that none of the plaintiff's proffered definitions of "per person" justify her claim that the higher "per accident" limitation should apply.

The appellants acknowledge that American Home's absolute limit of liability under the policy is $300,000 because there was only one "accident," and Endorsement No. 1 provides a maximum of $300,000 for any one accident. In so doing, the appellants acknowledge the validity of Endorsement No. 1 but not the correctness of the trial court's application of it to this claim.

### i. One Claim was Made to American Home

The appellants' alternative definitions for "per person" imply that valid claims were made by Ito's wife and two children. This is not the case.

■ The plaintiff, as personal representative of the deceased, proceeds in this action pursuant to our wrongful death statute. The decedent's beneficiaries' right to relief is solely provided by statute. Every wrongful death action in the Commonwealth "must be brought in the name of the personal representative of the deceased, but shall be for the exclusive benefit" of the deceased's beneficiaries. 7 CMC § 2102. It is the personal representative who holds a single cause of action against those who are liable for the death of the deceased. *Horwell v. Oregon Episcopal Sch.*, 787 P.2d 502, 503 (Or. App. 1990); *Huntington v. Samaritan Hosp.*, 666 P.2d 405, 406 (Wash. App. 1983), *aff'd*, 680 P.2d 58 (1984).

■ We agree with California that an insurer is liable for the single claim of bodily injury to the decedent and not for the multiple non-bodily injury claims of the decedent's beneficiaries, whose damages resulted from the death. In *Westfield Ins. Co. v. DeSimone*, 247 Cal. Rptr. 291, 293 (Ct. App. 1988), the court reasoned:

Defendants contend first that the trial court erred in ruling that each heir did not have a separate and distinct cause of action under Code

of Civil Procedure § 377. Not so. In *Vanguard Ins. Co. v. Schabatka, supra*, 46 Cal. App. 3d 887, 120 Cal. Rptr. 614, which the trial court expressly relied upon in making its ruling, this court rejected an argument almost identical to the one advanced by defendants in the case here, namely that the decedent's heirs 'were separately injured because of the death of their wife and mother and hence can together make claim on the multiple limits of the policy.' (*Id.*, at p. 893, 120 Cal. Rptr. 614.) We reasoned, in *Vanguard*, that the heirs' claims did not constitute separate *bodily injuries* under the policy, but rather separate *elements of damages* flowing from the single bodily injury of the decedent. (*Id.*, at p. 894, 120 Cal. Rptr. 614.) We then noted that in *Campbell v. Farmers Ins. Exch.* [67 Cal. Rptr. 175, 177 (1968), *overruled on other grounds* [], *Moncharsh v. Heily & Blase*, 832 P.2d 899 (Cal. 1992)], Justice Tamura, writing for this court, had disposed of a similar contention by observing A. . . where only one person was killed in an accident, the policy limit was $10,000 [the single injury limit] regardless of the number of heirs damaged."

*See also United Servs. Auto. Ass'n v. Lilly*, 266 Cal. Rptr. 691 (Ct. App. 1990); *Vanguard Ins. Co. v. Schabatka*, 120 Cal. Rptr. 614 (Ct. App. 1975).[30]

■ Here, there is but one claim for bodily injury, that of the decedent. Only Ito's personal representative (the plaintiff, Mrs. Ito) may recover for that single claim on behalf of herself and the two children, his three beneficiaries. The decedent's wife and two children do not have separate claims against American Home's insureds for Ito's death. Moreover, as noted in our discussion in section 6, *supra*, the plaintiff and her children do not have a separate claim for loss of consortium against the negligent defendants.[31] Their sole

---

[29] American Home, on the other hand, argues that: (1) the term "per person" as used in Endorsement No. 1 is not ambiguous; (2) even if the term is ambiguous, the $100,000 limit must apply because the appellants' alternative constructions are not "reasonable"; and (3) if we find, as the appellants suggest, that "per person" means a person making a claim or bringing suit, "the $100,000 limit still applies because there was never more than one 'claim' or one 'claimant' before the court." *See* American Home's Respondent Brief at 4-5.

[30] We reject the plaintiff's assertion that *Westfield Ins. Co.* and other cases such as *United Servs. Auto Ass'n* and *Vanguard Ins. Co.* are inapplicable here. It is true that the policies involved in those cases are distinguishable from the policy here. Nevertheless, the holding that an insurer is liable on a claim for the single bodily injury of a decedent rather than multiple non-bodily injury claims of a decedent's heirs applies here despite the difference in policy language. Any other result would be untenable.

[31] We do not decide whether loss of consortium is or is not a "bodily injury" for purposes of coverage liability. Under the circumstances presented here, the decedent's heirs do not have

source of relief is based on the statutory wrongful death claim. Thus, since they have no right to insurance proceeds other than through the plaintiff's claim as Ito's personal representative, it is Ito's bodily injury upon which liability attaches.

#### ii. The Policy is not Ambiguous

■■■ A policy will be enforced according to its terms by reading it as a whole. *Producers Dairy Delivery Co. v. Sentry Ins. Co.*, 718 P.2d 920, 927 n.7. (Cal. 1986); *United Servs. Auto. Ass'n*, 266 Cal. Rptr. at 692. The exception to this rule is where there is an ambiguity, in which case the ambiguous term is interpreted in favor of coverage. *Aim Ins. Co. v. Culcasi*, 280 Cal. Rptr 766, 771 (Ct. App. 1991), *review denied*.

■ Endorsement No. 1's "per person" limitation of $100,000 is not ambiguous. Simply because a term is not defined does not render it "ambiguous," as the plaintiff asserts. It will be afforded its plain and ordinary meaning "against the background of a layman's understanding of the entire policy." *Ayres v. Prudential Ins. Co. of Am.*, 602 F.2d 1309, 1311 (9th Cir. 1979); *Aim Ins. Co.*, 280 Cal. Rptr at 771.

American Home stated that its limit of liability is $100,000 "per person" for "bodily injury." Only one person suffered bodily injury.[32] That person was Ito, the decedent. Because there is only one bodily injury (death), the limit of liability is $100,000, regardless of the number of heirs claiming damages due to that death.

Even the plaintiff's lawyer admits: "I mean, we deal with these things all the time so, to us, per person, of course, that means the person injured, to a lawyer, but a lay person, unless he is specifically given a definition in the policy, that's what all the cases seem to say." Transcript at 49:20-24 (Apr. 4, 1991). We disagree and find nothing technical or ambiguous about the term or its application.

■ Section III is also not ambiguous: American Home's total liability is limited to $300,000, the "per accident" limit, "[r]egardless of the number of . . . claims made . . . on account of bodily injury." The plaintiff contends that "[t]his policy specifically says we don't care how many people were injured, we will—we don't care how many beneficiaries there are and anything else, all we care about is that if it's one person or five persons, the maximum amount of money that we will pay

is $300,000." Transcript at 53:16-22 (Apr. 4, 1991).

The plaintiff focuses on the word "regardless" and asserts that the term means that American Home must pay the "per accident" limit for the single claim made here.[33] We find nothing ambiguous about the meaning of this provision or the term "regardless." Contrary to the plaintiff's assertion, this section was drafted to cap American Home's liability at $300,000 where claims for more than three separate bodily injuries involved in one accident were being made and "total" damages exceeded $300,000. Section III's meaning is plain, understandable and reasonable. To rule that this provision sets the limit of liability in this case at $300,000 where there was only one person injured simply because there are three beneficiaries would amount to a "strained" construction of an otherwise reasonably worded provision. *Rodriguez v. Safeco Ins. Co. of America*, 821 P.2d 849, 851 (Colo. 1991); *Klamm v. Carter*, 730 P.2d 1099, 1101 (Kan. App. 1986).

Read together, the American Home policy provides coverage of up to $100,000 for a valid claim for damages based on one bodily injury. The policy also provides coverage of up to $300,000 "per accident" no matter how many persons are injured in a particular accident. The plaintiff's contentions that the policy is ambiguous and that the "per accident" limit also applies to a single claim are without merit. Only one claim based on one bodily injury could properly be made by the decedent's personal representative. American Home is liable for coverage of that claim in an amount not to exceed $100,000. We therefore hold that the trial court did not err in entering summary judgment in favor of American Home.

## V. CONCLUSION

For the foregoing reasons, we hold that:
1. The release is invalid and failed to exonerate any of the defendants from liability for their negligence.
2. Ito did not impliedly assume the risk of harm arising from defendants' conduct.
3. Ito was not contributorily negligent.
4. The trial court applied the correct standard of care in evaluating defendants' actions.
5. The trial court did not err in denying Hirai's motion for summary judgment based on Hirai's settlement agreement with the plaintiff.

---

a right to damages for loss of consortium.

[32] American Home does not dispute that the fatal injuries suffered by Ito constitute "bodily injury" under the policy.

[33] Ito argues that section III's term "regardless" is significant in defining policy limits: "It says regardless of the number of persons who sustained bodily injury, regardless of the number of persons. It could be one or it could be five." Transcript at 47:17-19 (Apr. 4, 1991).

6. The trial court did not err in dismissing the plaintiff's loss of consortium claim, but did so for the wrong reason.

7. The trial court did not err in its calculation of damages. Further, there was a sound basis for the damages awarded.

8. The trial court did not err in ruling that the coverage provided by the American Home insurance policy was limited to $100,000.

This case is **AFFIRMED IN PART, REVERSED IN PART**, and **REMANDED** to the trial court for the limited purpose of (1) entering an amended judgment against Macro, Yamagishi and Hirai, jointly and severally, in the amount of $2,434,857.55, and (2) determining whether MOE should be held jointly and severally liable to the plaintiff based on the theory that MOE is the "alter ego" of Macro. If the trial court determines that MOE is the alter ego of Macro, it should also enter judgment against MOE, jointly and severally with the other defendants.

